C. ALEXANDER CAPRON, as executor of the last will and testament of Alexander Luchars, deceased, complainant,

*v.*

ROBERT B. LUCHARS, individually and as executor of the last will and testament of Alexander Luchars, deceased, et al., defendants.

[Decided April 18th, 1932.]

*Mr. Walter E. Cooper,* for the complainant.

*Mr. Philip Goodell,* for the defendants Robert B. Luchars, Elizabeth Y. Urban and Helen L. Ketcham.

*Messrs. Riker & Riker,* for the defendants First National Bank and Trust Company of Montclair, and Theodore McC. Marsh, guardian *ad litem* of infant defendants.

BERRY, V. C.

The bill is by C. Alexander Capron, one of the executors of the will of Alexander Luchars, deceased, who died February 19th, 1931, and prays instructions. Robert B. Luchars, co-executor and son of the decedent, does not join as complainant, because his interests are adverse, but is made a defendant individually and as co-executor together with his sisters, Elizabeth Y. Urban and Helen L. Ketcham, five grandchildren of the decedent, and the First National Bank and Trust Company of Montclair, New Jersey, which company was named as successor trustee of the trust agreement hereinafter mentioned.

The controversy concerns the ownership of two thousand seven hundred and fifty-three shares of the common stock of "The Industrial Press," and one thousand nine hundred and eight shares of the stock of The Industrial Corporation of New Jersey, now in the possession of the executors.

On July 1st, 1921, Robert, Elizabeth and Helen, the three children of Alexander Luchars, assigned two thousand three hundred and fifty-nine shares of the common stock of "The Industrial Press" to Alexander Luchars in trust, to collect the net income and distribute it amongst them and their survivors in quarterly payments in the proportion of three-sevenths to Robert, and two-sevenths each to Elizabeth and Helen "or such portion of such income as in the uncontrolled judgment of the trustee he shall deem advisable to pay, except that in no year shall he distribute less income than six thousand ($6,000) dollars nor more income than accrues during that year, and except further, and if, prior to the termination of this trust, any or either of us shall die

leaving issue, such issue shall receive their parents' share by right of representation," and upon the death of the survivor of the three children, unless the trust was formally terminated in the manner provided in the trust agreement, the *corpus* devolved upon such issue.

Paragraph 8c of the agreement empowers the trustee to terminate the trust at any time that in his opinion it is wise and expedient to do so; the termination to be effective by the trustee signing an instrument of termination, and delivering copies thereof to each beneficiary who is entitled at that time to receive income. Upon such termination, the trustee is to turn over the entire trust estate to the three creators thereof and the issue of any of them who may at that time be deceased.

By an instrument executed by Robert, Elizabeth and Helen on May 9th, 1925, the requirement that the trustee distribute at least $6,000 per year was rescinded, but the other provisions of the trust agreement were confirmed.

The Industrial Press, the corporation above referred to, is engaged in the business of printing and publishing engineering trade journals and has been highly successful. The company is authorized to issue two thousand seven hundred and sixty-seven shares of common stock and two thousand four hundred and sixty shares of preferred stock; and on May 15th, 1930, two thousand seven hundred and fifty-three shares of the common stock were in the trust fund, three hundred and ninety-four shares having been added to the original number by purchase with $20,883.72 lent to the trust by Mr. Luchars; and also, in part, with accrued income. On that day the company had assets of over $1,500,000 and a surplus of approximately $970,000. The common stock had a book value of $412 per share, giving the two thousand seven hundred and fifty-three shares in the trust fund a value of $1,134,236. Approximately $890,000 of the company's assets was invested in marketable securities.

Several months prior to May 15th, 1930, Mr. Luchars took up with his three children the idea of separating the marketable securities from the other assets of The Industrial Press,

and creating a new trust with only those securities; his thought being that if business depression should injuriously affect The Industrial Press the trust fund, consisting of only the marketable securities instead of the stock of The Industrial Press, would not be impaired, and his children and grandchildren would be secure and protected with the income from the securities. Under this arrangement the trust fund would be considerably less than theretofore, because it would consist only of the securities instead of the two thousand seven hundred and fifty-three shares of common stock of The Industrial Press; but that was, nevertheless, the plan which he proposed to his children and which they approved. To put this plan into operation he laid out a program which he discussed fully with his son and daughters; and on several occasions he made memoranda of the various steps which he intended to take. He sent his memorandum notes to his lawyer, asking his advice and approval. These notes were introduced in evidence and they show that his plan was to be effected in the following manner:

1. Form a holding corporation under the laws of New Jersey.

2. Have The Industrial Press transfer to the holding company all or part of the securities in exchange for the stock of the holding company.

3. Terminate the trust by notice to the three children as provided by paragraph 8c.

4. Transfer to the children the shares of the common stock of The Industrial Press which constituted the trust fund.

5. Have the children immediately reassign the said common stock to him, transferring the same to his name on the books of the company.

6. Have The Industrial Press declare a dividend on its common stock, payable in the stock of the holding company.

7. With the stock of the holding company then in his possession by reason of its being turned over to him as the dividend above referred to, set up a trust along the same lines as the trust of July 1st, 1921, with the stock of the holding company as the *corpus*.

8. Mr. Luchars to retain and own outright the common stock of The Industrial Press.

In pursuance of this plan Mr. Luchars signed and delivered to his three children an instrument terminating the trust, appended to which was a writing subsequently executed by the three children, waiving their right to receive the subject-matter of the trust and authorizing the transfer of the principal and accumulated income of the trust estate to Mr. Luchars individually and in his own right; and he incorporated The Industrial Corporation of New Jersey, with an authorized capital of two thousand shares of common stock of no par value. In the instrument by which he sought to terminate the trust he referred to the trust agreement as that of May 10th, 1922, but intending, without doubt, that of July 1st, 1921, and this is not in dispute. He delayed carrying out the remaining steps of his proposed plan, however, waiting for a more propitious time to take the securities from the treasury of The Industrial Press and on February 19th, 1931, he died with his plan uncompleted. The executors then went on with the project. They had the common stock of The Industrial Press registered in their own names; they exchanged about $750,000 worth of securities owned by The Industrial Press for one thousand nine hundred and eight shares of stock of the Industrial Corporation of New Jersey, and they declared a dividend on the common stock of The Industrial Press, paying it in common stock of the New Jersey company. They have not, however, set up the new trust with the stock of the New Jersey company and the situation now is that the executors have in their name and possession the common stock of The Industrial Press, and the stock of the New Jersey company, the latter company owning marketable securities valued at $750,000 formerly owned by The Industrial Press.

The three children of Alexander Luchars, donors of the *corpus* of the trust of July 1st, 1921, all of whom are still alive and defendants herein, seek now to rescind their agreement whereby the alleged trust was terminated on the ground of the refusal of the trustee, their father, to perform, and

they seek also a decree directing the executors to deliver to the successor trustee named in the trust agreement, all of the stock in controversy. But there has been no refusal to perform. The three children fully performed their part of the agreement in the trustee's lifetime; he partially performed and, with the acquiescence of his children, delayed full performance, and his executors, without objection by the children, have partially performed since his decease. The agreement was never repudiated by any party to it. There is no ground for rescission now. The authorities cited in support of rescission are *O'Neill* v. *Supreme Council, American Legion of Honor, 70 N. J. Law 410; Roberts* v. *James, 83 N. J. Law 492; Traurig* v. *Levin, 102 N. J. Eq. 582; Plotkin* v. *Galowitz, 109 N. J. Eq. 304,* but they are not in point.

In the *O'Neill Case,* there was an express repudiation of the contract by one of the parties which gave the other an immediate right to rescind. In the other cases the rescission was based on fraud. In the instant case there is neither fraud nor repudiation. The filing of the present bill cannot be considered as a repudiation and defendants make no such claim. Undoubtedly, the executors are bound by the covenants and contract obligations of their decedent. *Chapman* v. *Holmes' Executors, 10 N. J. Law 20* (at *p. 32*); *Petrie* v. *Voorhees' Executor, 18 N. J. Eq. 285; Corle* v. *Monkhouse, 50 N. J. Eq. 537.*

On behalf of the grandchildren it is claimed that they had a vested right under the trust agreement and that the attempted termination of the trust was ineffective, first, because the instrument by which such termination was attempted referred to an agreement of May 10th, 1922, and not that of July 1st, 1921; second, that the requirements for the termination were not fully complied with because the *corpus* of the trust was not actually returned to the donors, such return being waived, but remained in the possession of the trustee after notice of termination given; and third, that the termination was void as a matter of law because it resulted in an advantage to the trustee. As to the first, the evidence is conclusive that the agreement of July 1st, 1921, was the

agreement in contemplation by all the parties at the time the agreement of termination was made and that the insertion of the date of May 10th, 1922, was by inadvertence and the result of the mutual mistake of all parties, and this is conceded. Such a mistake may be corrected. *2 Pom. Eq. Jur.* § *589.*

As to the second, it is not denied that the trust was subject to termination in the manner provided in the trust agreement, and that upon such termination the vested interest of the infants would have been divested. *Weehawken Ferry Co.* v. *Sisson, 17 N. J. Eq. 475; Sandford* v. *Blake, 45 N. J. Eq. 247.* But it is claimed that the mechanics of the termination were faulty and therefore ineffective; but it is conceded that if the *corpus* of the trust estate had been actually delivered by Mr. Luchars to his three children, the donors, following the notice of the termination, that would have put an end to any rights which the grandchildren might have had. Their vested interest would then have been divested. It is also conceded that if a week, a month or a year later, these children, all of them being of full age and competent, decided to make a gift of the trust property to their father, it would have been competent for them to do so. Also that if within a like period they had decided to return the trust property or a portion of it to their father under a new trust agreement and make an absolute gift to their father of the remainder, it would have also been competent for them to do so. Under such circumstances it is obvious that the grandchildren would have no cause for complaint. And, in fact, that is exactly what was done in this cause, except that the termination of the trust and the making of the gift by the donors to their father constituted a simultaneous transaction. Except for the mechanics of this transaction it could not be challenged, but equity looks to the substance rather than the form and in substance here no defect is perceived.

As to the third objection, it is true that a trustee will not be permitted to use the trust estate for his own profit, and that the donee of a power cannot execute it for pecuniary gain to himself, but this doctrine rests upon the existence

of bad faith towards the donor of the power. *Thompson's Executors* v. *Norris, 20 N. J. Eq. 489.* In that case Chief-Justice Beasley said:

"In considering the legal maxim involved, it must be treated, then, as a case in which the donee of a power has agreed for a benefit moving to herself, to surrender her right to appoint."

Then, after citing authorities, the chief-justice continued:

"These authorities abundantly suffice to show that the principle is unquestionably established, that an appointment to further the selfish interest of the donee of the power will not stand. The doctrine rests upon the ground of the existence of constructive bad faith towards the donor of the power. * * *"

It follows naturally and logically that if the arrangement is made with the knowledge and consent of the donor of the power this principle cannot apply. Here there was no fraud practiced upon the donors and the trustee acquired a personal benefit only because the donors intended that he should have it. In support of this contention of the infant grandchildren numerous authorities are cited, among them *Staats* v. *Bergen, 17 N. J. Eq. 297,* in which the trustee became a purchaser at his own sale for his own benefit; *Van Alstyne* v. *Brown, 77 N. J. Eq. 455,* in which the trustee permitted a mortgage to be foreclosed and bought in the trust property for himself; *Hill* v. *Hill, 79 N. J. Eq. 521,* in which the executors of a will made a lease to themselves of certain real estate and then sublet it at a profit of three hundred per cent.; and *Keely* v. *Black, 90 N. J. Eq. 439,* in which the president of the corporation became secretly enriched in dealing with the assets of the corporation. None of these authorities is applicable.

But it is further contended on behalf of the infant grandchildren, that assuming the original trust to have been effectively terminated, a new trust should now be set up in accordance with the declared intention of the deceased trustee, and this point is well taken. The establishment of a new trust was the avowed purpose of all the parties to the

transaction pursuant to which the original trust was terminated and which remains uncompleted. A decree that the executors carry out that purpose would be but an application of the maxim that equity regards as done that which ought to have been done. It is settled in this state that a parol declaration of trust of personal property is valid and enforceable. *Hooper* v. *Holmes, 11 N. J. Eq. 122; Eaton* v. *Cook, 25 N. J. Eq. 55; Pitney* v. *Bolton, 45 N. J. Eq. 639; affirmed, 46 N. J. Eq. 610; Janes* v. *Falk, 50 N. J. Eq. 468.*

In *1 Lew. Trusts 136,* the learned author says: "But chattels personal are not within the act (statute of frauds), and a trust by averment will be supported."

Professor Pomeroy states the rule to be that "where the subject-matter is personal property, a parol declaration of trust, if otherwise sufficient, is effectual." *3 Pom. Eq. Jur.* § *998, note.* The rule is otherwise with respect to a voluntary trust which is incomplete or imperfect, as, for instance, in the case of a gift of money deposited in a bank, when the bank book and control of the fund are retained by the donor (*Nicklas* v. *Parker, 71 N. J. Eq. 777*); or where a bank deposit is made to become effective on the death of the donor. *McCullough* v. *Forrest, 84 N. J. Eq. 101; Johnson* v. *Savings Investment and Trust Co., 107 N. J. Eq. 547.*

All of the elements which go to make up a valid trust are present in this case. There is a designated beneficiary, a designated trustee, actual delivery of the property to the trustee with the intention of passing the legal title thereto, and, furthermore, an unequivocal, explicit declaration of trust. The testimony of Mr. Becker, financial adviser to Mr. Luchars and of each of the three children of Mr. Luchars, leaves no room for doubt that it was the intention of all parties to create a new trust and that that intention continued down to the date of Mr. Luchar's death.

There will be a decree directing the executors to set up a new trust consisting of the stock in the New Jersey corporation and along the lines of the original trust, except that the shares of the *cestuis que trustent* should be equal instead of three-sevenths to Robert and two-sevenths to each of his two

sisters, that being the intention of the parties as indicated by their testimony. I shall advise a decree holding that the executors own, as a part of the estate of Alexander Luchars, the common stock of The Industrial Press, and that a new trust be set up as above indicated.

There is some question as to who should be appointed trustee of the new trust. The original agreement provided that upon the death of Mr. Luchars the First National Bank and Trust Company of Montclair, New Jersey, together with the three children; or such of them as were then living, should be the trustees. Robert testified, however, that his father intended to have a New York Trust Company appointed and that is substantiated by the codicil to Mr. Luchar's will which was introduced in evidence. In the codicil he refers to the fact that he had appointed the First National Bank and Trust Company of Montclair as a trustee of one of the trusts created therein, and also in certain other trusts provided for, and he substituted a New York trust company for the Montclair institution. Counsel will be heard before appointing a new trustee.